Filed 4/15/15  A.C. v. Super. Ct. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| A.C.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF RIVERSIDE COUNTY,<br><br>    Respondent;<br><br>RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Real Party in Interest. | E062828<br><br>(Super.Ct.No. SWJ007455)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Timothy F. Freer, Judge.  Petition denied.

Jodi M. Vande Witte for Petitioner.

No appearance for Respondent.

Gregory P. Priamos, County Counsel, James E. Brown, Guy B. Pittman, and Julie Koons Jarvi, Deputy County Counsel, for Real Party in Interest.

1

Petitioner A.C. (Mother) filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452, challenging an order of the juvenile court denying her reunification services and setting a hearing under Welfare and Institutions Code[1] section 366.26 as to her four-year-old child, A.L. She contends that the juvenile court erred by not ordering reunification services for her under section 361.5, subdivision (b)(10). We find no error, and deny Mother's writ petition.

I

FACTUAL AND PROCEDURAL BACKGROUND

Mother had a long history with child protective services beginning in 2006 due to her substance abuse and had participated in numerous services. Nonetheless, her parental rights were eventually terminated as to her two older children. Specifically, in May 2007, mother's eldest child A.B. was taken into protective custody due to caretaker absence/incapacity and unsafe living conditions in the home after Mother was arrested for possession of a stolen vehicle, accessory after the fact, and interfering with a police officer in the performance of his duties. A.B. was declared a dependent of the court in November 2007 and Mother was offered services. On May 13, 2008, A.B. was returned to Mother's care under family maintenance status. Mother was to participate in general counseling, parenting education, and substance abuse treatment. She was also referred to Family Preservation Court to receive treatment for drug abuse. She, however, failed to enroll in the program and failed to drug test as requested from April to September 2008,

---

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

and absconded with the child. On May 28, 2008, a protective custody warrant was issued as to A.B., and on November 12, 2008, A.B.'s father was granted sole legal and physical custody of the child. After A.B.'s father filed family law orders, the juvenile court terminated A.B.'s dependency.

In July 2008, Mother's second child G.C. was removed from Mother's care when Mother and the child tested positive for methamphetamine and cannabis upon the child's birth. The child was delivered at 28 weeks via C-section and weighed three pounds one ounce, and was 14 inches long. In November 2009, at the 12-month review hearing, G.C.'s father was granted sole legal and physical custody of the child. Mother was denied reunification services and G.C.'s dependency was terminated upon G.C.'s father filing family law orders.

In April 2010, child protective services received a referral alleging general neglect of Mother's third child A.L following her birth. However, because Mother was residing at a rehabilitation center where she had support and was appropriate and bonding with the child, the child was maintained with Mother. In February 2012, another referral in regard to A.L. was received alleging general neglect and domestic violence. The allegations were unfounded. In April 2013, a third referral involving A.L. was received involving Mother's use of methamphetamine and alcohol. The referral was evaluated out. In June and August 2013, two more referrals as to A.L. were received alleging Mother's drug use, failure to supervise the child, and allowing teenagers who resided in the home to steal things from neighborhood homes. The referrals were "closed as unable to locate." In July 2014, a sixth referral was received as to A.L. after Mother was allegedly beaten

3

up by her boyfriend. It was also alleged that Mother was a drug addict, had a history of prostitution and abusing methamphetamine, moved from place to place, and lived in a known drug house. Mother's whereabouts were unknown and the referral was "closed as unable to locate."

On October 31, 2014, the Riverside County Department of Public Social Services (DPSS) received another referral alleging general neglect as to A.L. It was reported that Mother, her boyfriend, and A.L. were living in a drug house with many adults in the home using methamphetamine, cocaine, marijuana, and narcotics. It was further reported that the home was very filthy, dirty with feces and urine everywhere, and infested with cockroaches and animals living in the home. Law enforcement also had concerns about the home and reported that they had received several complaints regarding prostitution and drug sales occurring in the home and about several individuals living in the home who were on probation or parole. The social worker had attempted to make contact with the family on November 5, 2014; however, no one answered the door.

On November 18, 2014, with the assistance of law enforcement, the social worker made contact with individuals, including Mother, residing in the home. When the officers asked everyone in the home to exit the home, Mother came outside of the home with A.L. in her arms. Mother looked disheveled, and an officer, an expert in drug recognition, conducted a field sobriety test on Mother. The officer assessed that Mother appeared to be under the influence of methamphetamine. Mother denied living in the home and claimed to be helping a friend move. She also denied using drugs and alcohol or having any mental health issues. She admitted to having her parental rights terminated

as to her older children; and when asked to complete a drug saliva test, Mother stated that she may be positive for amphetamines as she took over the counter diet pills.

Mother would not allow the social worker to speak to the child in private. In addition, when the child stated that she and her mother resided in the home, Mother stated that the social worker could not speak with the child. Thereafter, the owner of the home allowed the social worker to enter the home and showed the social worker the room Mother and the child were staying in. When the social worker and the officers entered the home, they noted a foul odor that smelled of cigarette smoke, feces, and old putrid garbage. They also observed flies everywhere in the home clustered around a dead cockroach on the kitchen counter and two almost empty refrigerators in the kitchen, one of which had rotting mold and flies coming out of it. The room in which Mother and A.L. were staying had a hole in the wall outside. The bathroom the child used was filthy with no working lights and was infested with cockroaches. The social worker determined that other individuals residing in the home had a criminal history and/or were on probation; some also had mental health issues. Based on Mother being under the influence of methamphetamine, Mother's history with child protective services due to her drug use, the home posing a safety hazard to the child, and the home lacking food for the child, the child was taken into protective custody and placed in a foster home.

The father of A.L., C.S. (Father), also had a history with child protective services.[2] Father reported that he was aware that Mother was using methamphetamine, was not

---

[2] Father is not a party to this appeal.

doing well, was unstable, and moving around from place to place. He noted that he shared custody of A.L. with Mother and that Mother would lie to him stating that she would take the child for a little while and then would disappear with her. Father further stated that he was in prison for spousal abuse in 2009 and did not know he was the father of A.L. until Mother's ex-boyfriend informed him. Father also noted that he was diagnosed with "Schizophrenic-Effective" disorder and did not believe he required treatment. The social worker noted that while speaking with Father, Father had become very agitated, appeared very threatening, and fluctuated between periods of outbursts, crying, and calmness.

Mother also had a criminal history involving arrests and/or convictions for receiving stolen property, shoplifting, petty theft, possession of controlled substances/drug paraphernalia, and being under the influence of controlled substances.

On November 20, 2014, a petition was filed on behalf of A.L. pursuant to section 300, subdivision (b), based on Mother's history of abusing controlled substances, her extensive history with child protective services, her living conditions, her criminal history, and Father's unresolved mental health issues, his extensive history with child protective services, and his criminal history. At the detention hearing, the child was formally removed from parental custody and maintained in a foster home. The parents were provided with services pending further proceedings.

The social worker interviewed Mother again on December 13, 2014. At that time, Mother denied the allegations in the petition, claiming she was only visiting the home and that she never lost custody of her older children due to drug use. She, however,

6

admitted to having a criminal history. A result of Mother's drug test taken on November 18, 2014, showed that she was positive for amphetamines and methamphetamine. The social worker recommended that the allegations in the petition be found true; that the parents be denied services pursuant to section 361.5, subdivision (b)(10); and that a section 366.26 hearing be set.

DPSS provided the parents with a list of resources and services. Mother participated in the MFI "MOMS" outpatient substance abuse program with no negative reports. She was compliant with the program and testing clean. Mother also submitted to a hair follicle test. The test was received on December 10, 2014, and was negative for all controlled substances. Mother also participated in visitation twice a week for two hours with no negative reports.

A contested jurisdictional/dispositional hearing was held on February 4, 2015. At that time, the trial court heard Mother's stipulated testimony, which stated the following: Mother had participated in the Born Free Program from November 24, 2009 to June 4, 2010, and had graduated from that program; while in the Born Free Program, she had given birth to A.L., who was born drug free; that Mother had participated in a sober living program from June 2010 to September 2010; that she had maintained a household for herself and her daughter in Lake Elsinore, from September 2010 to May 2012, and again when she moved to Hemet from May 2012 to November 2014; that she had attempted to change the child's pediatrician and further her education through online programs; that she had maintained a home for herself and her child; that she was currently participating in the MOMS MFI Program and testing clean, including a clean

7

hair follicle test; that she was the only caretaker for the child; that the child had no relationship with Father; that she had maintained regular and consistent visitation with the child; and that during the visits, the child asks when she can come home.

Following argument from counsel, the juvenile court found the allegations in the petition true and declared the child a dependent of the court. The court denied services to the parents pursuant to section 361.5, subdivision (b)(10), and set a section 366.26 hearing. Mother filed a notice of intent to file a writ petition on that same day, February 4, 2015.

## II

## DISCUSSION

Mother contends that the evidence is insufficient to support the juvenile court's order denying her reunification services under section 361.5, subdivision (b)(10). She asserts that she made reasonable efforts to address the problems that led to the removal of A.L.'s half siblings.

Section 361.5, subdivision (b)(10), authorizes the denial of services based on a parent's previous failure to rehabilitate. Specifically, section 361.5, subdivision (b)(10), allows a court to deny services if it finds, by clear and convincing evidence "[t]hat the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian . . . and that, according to the findings of the court, this parent or guardian has not subsequently made

8

a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian."

" 'Once it is determined one of the situations outlined in [section 361.5,] subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]' " (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744, superseded by statute as stated in *In re Angelique C.* (2003) 113 Cal.App.4th 509, 518 and *In re Allison J.* (2010) 190 Cal.App.4th 1106, 1113.)

We affirm an order denying reunification services if there is substantial evidence to support the order. (*Curtis F. v. Superior Court* (2000) 80 Cal.App.4th 470, 474.) "In making this determination, we must decide if the evidence is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the court's order was proper based on clear and convincing evidence. [Citation.]" (*Ibid.*; *Amber K. v. Superior Court* (2006) 146 Cal.App.4th 553, 560 [Fourth Dist., Div. Two].) The party challenging the ruling of the lower court has the burden to show that the evidence is insufficient to support the ruling. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

Section 361.5, subdivision (b)(10), contemplates a two-prong inquiry: (1) whether the parent previously failed to reunify with the dependent child's sibling or half sibling; and (2) whether the parent "subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling . . . ." (§ 361.5, subd. (b)(10).) It appears that only the second prong is disputed here. That "clause in the statute provides a means of mitigating an otherwise harsh rule that would allow the court to deny services simply

9

on a finding that services had been terminated as to an earlier child when the parent had in fact, in the meantime, worked toward correcting the underlying problems." (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 842 [Fourth Dist., Div. Two].)

In applying that part of the statute, case law instructs, "the 'reasonable effort to treat' standard" of subdivision (b)(10) "is not synonymous with 'cure.' " (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464.) Thus, for example, the "mere fact that [Mother] had not entirely abolished her drug problem would not preclude the court from determining that she had made reasonable efforts to treat it." (*Ibid.*) Rather, the statute provides a " 'parent who has worked toward correcting his or her problems an opportunity to have that fact taken into consideration in subsequent proceedings.' [Citation.]" (*K.C. v. Superior Court* (2010) 182 Cal.App.4th 1388, 1393 (*K.C.*).) According to the court in *Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, the focus is on effort, not progress: the provision is meant "to ensure that lackadaisical or half-hearted efforts would not be deemed adequate rather than to additionally require a certain level of progress." (*Id.* at p. 99.)

Here, substantial evidence shows that Mother did not make reasonable efforts to address the problems underlying A.L.'s siblings' removals. In May 2007, Mother was arrested for possession of a stolen vehicle, accessory after the fact, and interfering with a police officer in the performance of his duties. A.L.'s half sibling A.B. was taken into protective custody due to caretaker absence/incapacitated and unsafe living conditions in the home. A.B. was placed in Mother's care under family maintenance status. Mother was to participate in general counseling, parenting education, a substance abuse program,

and drug testing. She was also referred to Family Preservation Court to receive treatment for her drug abuse. She, however, failed to enroll in the program and failed to drug test from April to September 2008, and absconded with the child. A protective custody order was issued as to A.B., and A.B.'s father was eventually granted sole legal and physical custody of the child. In 2008, Mother's second child G.C. was removed from Mother's care after both Mother and the child tested positive for methamphetamine and marijuana upon the child's birth. Mother was denied services as to her second child under section 361.5, subdivision (b)(10), and at the 12-month review hearing, G.C.'s father was granted sole legal and physical custody. The dependency in both A.B.'s and G.C.'s cases was terminated upon filings of family law orders.

Mother asserts that after A.L.'s half siblings' dependencies, she had engaged in 10 months of services in a drug treatment program on her own and gave birth to A.L., who was drug free. According to Mother's stipulated testimony, Mother had participated in a substance abuse program from 2009 to 2010 and had lived in a sober living home from June 2010 to September 2010. However, there is no evidence that she had participated in any other services or made reasonable efforts to treat the problems that led to the removal of A.L.'s half siblings. In fact, from February 2012 to October 2014, six referrals were made to DPSS concerning A.L. alleging Mother's substance abuse, living conditions, and domestic violence. Furthermore, while Mother had completed a substance abuse program and A.L. was born drug free approximately four years prior to the current dependency matter, Mother's circumstances had deteriorated by the time A.L. was detained. As the trial court noted, Mother did not simply have a relapse or use

11

methamphetamine on an occasion when A.L. was detained; instead, Mother's circumstances at the time A.L. was detained were indicative of someone who was abusing controlled substances as a lifestyle.

Moreover, there is no evidence to suggest Mother had made reasonable efforts to treat all of the problems leading to the removal of A.L.'s half siblings. Mother's first child A.B. was taken into protective custody due to unsafe living conditions in the home. When A.L. was detained, the home was found to be hazardous and unsafe. In addition, law enforcement also had concerns about the home and reported that they had received several complaints regarding prostitution and drug sales occurring in the home and about several individuals living in the home who were on probation or parole. A.L. and several individuals residing in the home had confirmed that Mother had been residing in the home with A.L. in a bedroom. In addition, when A.L. was detained, Mother appeared to be under the influence of methamphetamine. Although Mother had engaged in services following A.L.'s half siblings' dependencies, Mother had continued to abuse drugs and reside with A.L. in an unsafe living condition. Further, the record shows that Mother had no job or prospects of securing a job or a residence of her own, and had resided in a structured setting when she gave birth to A.L. Indeed, there is no evidence in the record to suggest that Mother was able to provide for herself outside of a residential program, much less her child. We conclude that substantial evidence supports the juvenile court's finding that Mother did not make "a reasonable effort to treat the problems that led to removal of" A.L.'s half siblings. (§ 361.5, subd. (b)(10).)

12

Mother argues that the juvenile court equated "reasonableness with a success or a cure, implying that had her efforts been 'reasonable' the current dependency would not exist." Mother also asserts that the juvenile court "found that the mother's efforts were not poor or half-hearted, thus implying they were reasonable." Mother's interpretation of the juvenile court's comments is in error. The juvenile court correctly noted the language in section 361.5, subdivision (b)(10), and pointed out that the language in section 361.5, subdivision (b)(10), does not require, as indicated by DPSS, whether Mother made a "poor effort or a half-hearted effort." The court also noted that "[w]hat she did in the meantime, after the social worker and law enforcement arrived—it appears that mother's made a significant effort. [¶] And—based on [mother's counsel's arguments] . . . it's a better effort than she did on the prior case, but that's not what the code is saying . . . what the code is saying is that reasonable efforts to prevent her putting herself in the position now that she's got another child in the same situation." In conclusion, the court found that there was clear and convincing evidence that Mother had not "achieved the language that is required in [section] 361, sub[division] (b), subsection (10)," to make reasonable efforts to treat the problem that led to the removal of A.L.'s half siblings. Substantial evidence supports the court's finding. Prior to the current dependency, Mother had only attended one substance abuse program several years prior. From October 2010 to October 2014, Mother did nothing to treat her substance abuse or provide safe living conditions for A.L.

*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908 (*R.T.*) is instructive. In *R.T.*, the child was removed from his parents' care after his father was arrested for domestic

violence and the mother admitted drug and alcohol use. The parents had previously failed to reunify with the child's sibling, P.T., who was removed based on the parents' substance abuse and chronic homelessness. (*Id.* at p. 911.) The parents had made only minimal efforts to engage in reunification services in P.T.'s case. But, two months after the minor's removal, the mother moved to a safe residence, separated from the father, was following mental health recommendations, and had started attending a drug treatment program and 12-step meetings. Notwithstanding these efforts, the juvenile court ordered bypass of reunification services, citing the termination of parental rights in P.T.'s case and finding the parents had not made reasonable efforts to treat the underlying problems. (*Id.* at pp. 911-913.)

The Court of Appeal explained: "We do not read the 'reasonable effort' language in the bypass provisions to mean that any effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort and as such render these provisions inapplicable. It is certainly appropriate for the juvenile court to consider the duration, extent and context of the parent's efforts, as well as any other factors relating to the quality and quantity of those efforts, when evaluating the effort for reasonableness. And while the degree of progress is not the focus of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the reasonableness of the effort made. [¶] Simply stated, although success alone is not the sole measure of reasonableness, the measure of success achieved is properly considered a factor in the juvenile court's determination of whether

14

an effort qualifies as reasonable." (*R.T.*, *supra*, 202 Cal.App.4th at pp. 914-915, italics omitted.)

In concluding that substantial evidence supported the juvenile court's finding, the *R.T.* court observed: "There is no evidence that mother made any effort to address her substance abuse issues after minor was returned to her, until minor was once again removed and bypass was recommended. By then, mother had been using drugs again for nearly a year, if not longer, and minor was once again languishing without proper care as a result. There is no evidence in the record that mother, in the month or two of services following minor's second removal, had engaged in these services in any meaningful way. [Citation.] In any event, the juvenile court properly could conclude this recent effort, even assuming the effort were substantiated, was simply too little, too late." (*R.T.*, *supra*, 202 Cal.App.4th at p. 915, italics omitted.)

By the time of the dispositional hearing in A.L.'s case, Mother was participating in an outpatient substance abuse program with no negative reports. She was compliant with the program and testing clean. In addition, her hair follicle test result showed negative for all controlled substances. However, the duration, extent, and context of Mother's efforts reveal a pattern that, especially when combined with Mother's actual progress, could reasonably lead to the conclusion that Mother's efforts were only superficial. Although there are other inferences that can be drawn, the timing of Mother's efforts does reasonably suggest that she was not motivated by a genuine desire to change. Rather, one could reasonably infer that Mother was only prompted to resume a substance abuse program after A.L. was removed from her care.

15

When the record is viewed in the light most favorable to the judgment, the juvenile court could reasonably conclude that Mother's efforts to deal with her persistent substance abuse issues, and to provide for the safety and security of her child, were "lackadaisical or half-hearted" (*Cheryl P. v. Superior Court, supra*, 139 Cal.App.4th at p. 99) considering the duration, extent, and context of her efforts. The juvenile court could reasonably reject Mother's argument that her three months of participation in a substance abuse treatment program constituted a reasonable effort to treat her long-term methamphetamine addiction and to provide proper care for her child. In view of Mother's history of substance abuse and prior opportunities to treat her addiction, the record supports the conclusion that Mother's recent participation in substance abuse treatment, while a positive step, is both qualitatively and quantitatively insufficient to support the finding that she made a reasonable effort to treat the problems that had led to the removal of A.L.'s half siblings from her care. (*R.T.*, *supra*, 202 Cal.App.4th at p. 914.)

The purpose of the reasonable effort prong of section 361.5, subdivision (b)(10), is not to create further delay for a child by allowing a parent, who up to that point has not reasonably addressed his or her problems, another opportunity to do so. (*In re Harmony B.*, *supra*, 125 Cal.App.4th at p. 843.) Viewing Mother's history in its totality, we conclude that there is substantial evidence to support the juvenile court's finding that Mother did not make a reasonable effort to treat the problems that led to the removal of A.L.'s half siblings from her care. Accordingly, the juvenile court did not err when it denied reunification services to Mother under section 361.5, subdivision (b)(10).

16

III

DISPOSITION

The petition for extraordinary writ is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:


McKINSTER
J.


KING
J.